NO. 18-6159

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

AHMED MOHAMED SHEIK OSMAN

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DISTRICT COURT NO. 3:16-CR-00079

# APPELLANT'S PRINCIPAL BRIEF

MICHAEL C. HOLLEY
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

Counsel for Mr. Osman

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ..............................................1

STATEMENT OF JURISDICTION.........................................................................1

ISSUE PRESENTED.............................................................................................2

INTRODUCTION ..................................................................................................3

STATEMENT OF THE CASE...............................................................................4

STANDARD OF REVIEW ....................................................................................3

SUMMARY OF THE ARGUMENT ......................................................................16

STANDARD OF REVIEW ...................................................................................17

ARGUMENT ........................................................................................................17

I. It violates the Due Process Clause to commit Osman even longer absent proof of progress towards the goal of restoring competency .................17

CONCLUSION.......................................................................................................22

CERTIFICATE OF SERVICE ...............................................................................23

CERTIFICATE OF COMPLIANCE.......................................................................23

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............24

## TABLE OF AUTHORITIES

**Cases Cited**

*Foucha v. Louisiana*, 504 U.S. 71 (1992)....17

*Hoang Minh Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003) ....17

*Jackson v. Indiana*, 406 U.S. 715 (1972).... 2, 17-23

*Jones v. United States*, 463 U.S. 354 (1983) ....17

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003) .... 20-21

*Sell v. United States*, 539 U.S. 166 (2003). ....1, 8, 10, 18

*United States v. Duncan*, 968 F. Supp. 2d 753 (E.D. Va. 2013) ....19

*United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008)....1, 22

*United States v. Rogers,* 83 F. Supp. 3d 657 (M.D.N.C. 2015) ....20

**Statutes and Rules**

18 U.S.C. § 3231 ....1

18 U.S.C. § 4241 ....22

18 U.S.C. § 4241(d)(1)....7, 22

18 U.S.C. § 4241(d)(2)....22

18 U.S.C. § 4241(d)(2)(A) ....7

Fed. R. App. P. 32(a)(7)(C) ....23

## STATEMENT REGARDING ORAL ARGUMENT

Because he has sought to expedite his appeal, the appellant does not request oral argument although he would welcome the opportunity to appear before the Court.

## STATEMENT OF JURISDICTION

The District Court exercised jurisdiction under 18 U.S.C. § 3231, which provides it with jurisdiction over all federal crimes. The appellant appeals from the district court's pretrial order of November 1, 2018, that authorized the government to commit Osman for another four months of competency restoration. (Order, R.112, PageID # 749; Notice of Appeal, R.113, PageID # 750.) This Court has jurisdiction over this appeal because the collateral-order doctrine affords jurisdiction over pretrial orders that authorize commitment for competency restoration. *United States v. Magassouba,* 544 F.3d 387, 400 (2d Cir. 2008); *see generally Sell v. United States*, 539 U.S. 166, 176-77 (2003).

## ISSUE PRESENTED

To extend the commitment of a defendant solely for the purpose of restoring competency to stand trial, the government must prove not only "that the defendant probably soon will be able to stand trial" but also that it is making "progress toward that goal." *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). After Ahmed Osman had already been committed for competency restoration for fifteen months, the government admitted that Osman remained incompetent, and it did not even claim, much less prove, it was making progress towards the goal of restoration. Did the district court violate Osman's due process rights by granting yet another extension?

## INTRODUCTION

In March 2016, Osman was arrested and charged with federal offenses. The government offered a binding Rule 11(c)(1)(C) plea bargain to resolve all charges for a within-guidelines sentence of 30 months. But then the district court recognized that Osman, due to delusional thinking, was not competent to proceed. By October 2018, Osman had been committed for competency restoration for fifteen months. The government sought authorization to continue that commitment for another four months even though it could not even claim, much less prove, to have made any progress. Osman, having spent more time in detention than the plea agreement would require, opposed on due-process grounds the request to extend his commitment. The district court summarily granted a four-month extension without even addressing Osman's due process arguments.

Supreme Court precedent holds that, to continue a commitment for competency restoration, the government must prove it has made progress toward its goal. Despite having fifteen months to make progress, the government has made none, and it does not even claim to have made any. Meanwhile, Osman has served more time in detention that the agreed-upon sentence would require. The Court should reverse and remand ordering that his commitment cease.

## STATEMENT OF THE CASE

In 1975, Ahmed Osman was born in Somalia. (McRainey Report, R.33, PageID # 52-53.) Due to civil unrest, Osman, as a boy, fled with his family to a refugee camp in Kenya, and, in 1996, he was granted refugee status to migrate to the United States. (*Id.*) Since that time, he has been lawfully employed, frequently as a taxi driver in Nashville, Tennessee. (*Id.* PageID # 54.) In 2008, one of his customers shot him in the chest. (*Id.* PageID # 53.)

Since roughly that time, Osman's family has tried to get him care for his apparent mental illness, which includes delusional and paranoid thinking. (McRainey Report, R.33, PageID # 54-55.) He has refused help, "adamant about not having a problem." (*Id.*)

In January 2016, FBI Agent Patrick Wright went to Osman's home in Nashville, but he found only Osman's mother there. (Shafer, Prelim. Hr'g Tr., R.115, PageID # 760, 780.) Next, Agent Wright used his cell phone to call Osman on his cell phone, and Osman explained he was temporarily in Arizona. (*Id.* PageID # 760-61, 777.) The phone call was "cordial," and Agent Wright told Osman to contact him upon return to Nashville. (*Id.*)

It is now clear, however, that Osman thought Agent Wright was not an FBI agent but rather a "bad guy"—perhaps a Somali agent or a Tennessee "hillbilly" or "redneck"—who intended to do harm to him or, during his absence, to his mother.

(Summary of Recorded Statement, R.49-5, PageID # 146-48; McRainey Report, R.33, PageID # 60.) A couple days after that first call, Osman called Agent Wright back, and Wright told him that he was wanted for questioning because his name came up as saying he associated with members of ISIS. (Shafer, Prelim. Hr'g Tr., R.115, PageID # 780-82.) That belief about an ISIS connection was wrong, and it was apparently unorthodox for an FBI agent to make such an allegation to a suspect over the phone. (*See* Holley Aff., R.33-1, PageID # 63-64; Recording of Statement at 55:15 to 55:30, R.68; District Court, Hr'g Tr., R.103, PageID # 707.)

That call was the last one between Osman and Agent Wright because Wright declined to respond to Osman's subsequent calls or his increasingly frantic and deranged text messages (e.g., offering to give Wright "farms horses dogs and pigs in a big massive ranch" if Wright would "open [his] mouth"). (Texts, R.49-6, PageID # 153-73.) Osman accused Wright of not actually being an FBI agent, and ultimately his texts turned threatening. (*Id.*)

In light of those texts, Agent Wright prompted Osman's arrest in Arizona on March 5, 2016. (Report of FBI Agent Rice, R.49-7, PageID # 175.) Osman waived his *Miranda* rights and said he had sent the texts because he thought Wright was "a bad guy, someone who wanted to kidnap [his] mom or do something to [him]." (Summary of Recorded Statement, R.49-5, PageID # 146.)

The government brought two cases against Osman: (1) in the Middle District of Tennessee, it charged him with threatening a federal agent and making an interstate threat (Indictment, R.15, PageID # 27); and, (2) in the District of Arizona, it charged him with possessing a firearm as a felon since they found a handgun in his hotel room when they arrested him.[1] (*See* Rule 20 Documents, R.1, PageID #1-5 in M.D. Tenn. Case No. 3:16-cr-00169.) Osman was brought to the Middle District of Tennessee for his preliminary hearing, and the parties reached an agreement under Rule 20 to transfer the Arizona charge to Tennessee for a guilty plea. (*Id.*) The district court was provided with the Rule 11(c)(1)(C) plea agreement intended to resolve both cases. (Plea Agreement, R.79-1, PageID # 477, 485, 486; *see* Motion, R.79, PageID # 468-69.) The agreement provided for a within-guidelines sentence of 30 months. (*Id.*)

A few days later, when reviewing the agreement with Osman, undersigned counsel developed serious doubts about Osman's competence to rationally decide whether to plead guilty. (Motion to Continue, R.26, PageID # 43; Holley Aff., R.28, PageID # 45.) After getting a continuance of the plea hearing, counsel filed

[1] In 2013, Osman was convicted in Arizona state court of "Attempted Transportation of Marijuana for Sale (Two or More Pounds)" and was sentenced to probation. (Arizona Documents, R.49-4, PageID # 130.) On March 15, 2016, the Arizona court granted Osman's motion to "set aside the judgment of guilt" and it "restore[d] his right to bear arms." (*Id.* PageID # 142.) Osman apparently has no other criminal record. (*See id.* PageID # 140; Plea Agreement, R.79-1, PageID # 485.)

the report of a psychologist who opined Osman, due to delusional thinking, was not competent. (McRainey Report, R.33, PageID # 61.) On October 17, 2016, the district court granted the government a statutory 30-day period to evaluate Osman for competency. (Order, R.39, PageID # 71.) *See* 18 U.S.C. § 4247(b) (allowing 30 days for competency evaluation and an extension of, at most, 15 days).

More than 100 days later, on January 31, 2017, the government filed its expert's evaluation, opining that Osman was competent. (Szyhowski Report, R.41, PageID # 73.) That opinion was evidently in error. In the competency hearing held in April 2017, the government's expert poorly defended his conclusion, and the district court found Osman was not competent. (Order, R.72, PageID # 432; *see* Hr'g Tr., R.69, PageID # 292-338.)

On April 27, 2017, pursuant to 18 U.S.C. § 4241(d)(1), the district court committed Osman for competency restoration. (Order, R.72, PageID # 432.) The court ordered, as mandated by statute, that Osman "shall be hospitalized for a reasonable period of time, not to exceed four months." (*Id.*) It directed the government to ask the court if it wanted additional time to treat Osman. (*Id.*)

Eleven full months would pass before the government filed a report on March 29, 2018, seeking permission to force Osman to take antipsychotic drugs. (Order, R.77, PageID # 449.) During that period, the government obtained one four-month extension under 18 U.S.C. § 4241(d)(2)(A); it apparently did so

without providing advance notice to Osman's counsel of its request. (Order, R.75, PageID # 437; *see* Motion, R.95, PageID # 534.)

During that eleven-month commitment period, personnel at Federal Medical Center (FMC) Springfield did the following.

- They reviewed documentation regarding Osman and did four psychological tests similar to the ones that others had already performed.
- They sent him to "competency restoration class" which is a one-hour-per-week group class that teaches detainees about court procedures—and which was a class that they have admitted he did not need.
- They declined to provide him any psychotherapy.
- At the end of the first four-month period, they asked him if he would take medications; he refused. At the end of the entire period, they asked him again, and again he refused.

(Hr'g Tr., R.103, PageID # 565, 568, 574, 578-79, 599, 600, 602.) Basically, rather than meaningfully treating Osman to restore competency, FMC Springfield spent the entire eleven-month period diagnosing Osman again and confirming the Court's finding that he was not competent. (*Id.* PageID # 602-04, 621.)

At that juncture, the government sought permission from this Court for authorization under *Sell v. United States*, 539 U.S. 166 (2003) to force Osman to take the antipsychotic medications he had refused many months previously. (*See* Order, R.77, PageID # 449.) This Court held the *Sell* hearing on June 14, 2018, which was a few months *after* Osman would have already completed the 30-month sentence offered in the binding Rule 11(c)(1)(C) plea agreement (assuming he earned his four months of good-time credit). (*See* Order, R.92, PageID # 525.)

At that *Sell* hearing, Dr. Preston-Baecht (Preston) and Dr. Sarrazin of FMC Springfield testified. Dr. Preston, a staff psychologist, explained her diagnosis of Osman as bipolar with mood-congruent psychotic features. (Preston, Hr'g Tr., R.103, PageID # 557, 570.) Dr. Sarrazin, a psychiatrist, insisted that the only way to cure Osman—and essentially anyone with such a diagnosis—would be to treat him with one of four specified antipsychotic drugs, one of which was aripriprazole (Abilify). (Sarrazin, Hr'g Tr., R.103, PageID # 612, 624-28.) He said that a drug of this antipsychotic type was the "key" to Osman's treatment, stating that "the key piece of the treatment is the . . . antipsychotic medications." (*Id.* PageID # 639.) After the defense expert said he would start treating someone like Osman with just a mood stabilizer like Depakote, Dr. Sarrazin stuck to his initial position, stating that he would not start with just a mood stabilizer because the antipsychotic medication was the key to Osman's restoration. (*Id.* PageID # 694-98.) The

district court granted the government's *Sell* motion, saying it could medicate Osman as Dr. Sarrazin had proposed, and it asked the government to provide an order as it saw fit. (*Id.* PageID # 709, 713.)

On June 25, 2018, the government provided the Court with that proposed order, which the district court entered. (Order, R.92, PageID # 527.) The order directed the government to start Osman on "oral mood stabilizers Lithium Carbonate and Valproic Acid," which is also known as Depakote. (*Id.* PageID # 527.) It directed that if Osman "does not have a significant clinical response to the mood stabilizers alone, he will be started on the oral antipsychotic aripiprazole," which is known as Abilify. (*Id.*) The government did not explain why it had changed its position: whereas during the hearing Dr. Sarrazin had insisted that the antipsychotic medications were the key to curing Osman, when submitting its order the government sought to start with just a mood stabilizer.

The Court's order authorized another four months of commitment for competency restoration, with a deadline expressly set to expire on October 26, 2018. (Order, R.92, PageID # 528.)

To Osman's detriment, the government moved slowly in transporting him back to FMC Springfield, which was a mere seven-hour drive from Nashville. (Def.'s Response, R.104, PageID # 718.) Instead of going directly back to FMC Springfield, Osman spent the first two months in limbo in a county jail where he

often had to sleep on the floor and could not get the food he needed; he called undersigned counsel frequently because he was distressed; and counsel's efforts to get him moved promptly were fruitless. (*Id.* PageID # 718-19.) On August 23, 2018, Osman was finally delivered to FMC Springfield for treatment. (Preston/Montminy Email, R.98, PageID # 543.) Basically, Osman spent the first two months of the four-month treatment period in limbo and increasingly distressed.

From August 24 through October 9, 2018, the FMC Springfield doctors required Osman to take only Depakote (Preston/Montminy Email, R.98, PageID # 543), which was treatment that Dr. Sarrazin had opined would be ineffectual. On October 2, Osman called undersigned counsel. (Holley/Preston Email, R.104-1, PageID # 727.) According to Osman, the Depakote was making him sleep most of the day, but he enjoyed sleeping so much because he was dreaming a lot about Fatima, who appears to be a fictional woman whom Osman has long claimed to be his girlfriend, fiancé, or wife. (*Id.*) And he was very enthused that he could dream about Fatima, be awoken for a meal or medication, and then go right back to sleep and resume the dream where it had left off. (*Id.*)

On October 3, undersigned counsel reported this situation to Dr. Preston of FMC Springfield. (Holley/Preston Email, R.104-1, PageID # 727.) This report prompted the FMC doctors to evaluate Osman two days later; they confirmed he

was delusional about "Fatima" and remained incompetent to stand trial. (Preston/Montminy Email, R.98, PageID # 543.) Apparently since counsel had prompted them to recognize that the Depakote was just making the manic/delusional Osman into a somnolent/delusional subject, Dr. Sarrazin decided to start him on a second drug, aripiprazole (Abilify), on October 9, which was just 17 days before the authorized four-month treatment period was due to end. (*See id.*) Although FMC Springfield reports that Osman was "agreeable" to taking this drug (*id.*), Osman has clearly told undersigned counsel he is afraid of all of their drugs and does not want to take any antipsychotic, including Abilify; if he has to take anything, he wants to stick with just the Depakote, which enables a pleasant dream life.

On October 12, the government filed a request for an extension under 18 U.S.C. § 4241(d)(2) of Osman's commitment for competency restoration. (Notice, R.98, PageID # 541.) Although undersigned counsel had asked for medical records to help litigate this issue (Def.'s Motion, R.95, PageID # 533), the government provided just an email from Dr. Preston, the psychologist. (Notice, R.98, PageID # 541.) In that email, she stated the things already mentioned above, and she said that "[o]n average, most individuals require four to eight months of treatment prior to successful competency restoration." (*Id.*) And she stated that in her opinion "with additional treatment, Mr. Osman is likely to be successfully

restored to competency," pointing out that he had been on Abilify for only three days. (*Id.*) She implicitly admitted that FMC Springfield had made no progress toward the goal of competency: "At the present time, I do not believe Mr. Osman is competent . . . That being said, in my experience, it is still very early in his treatment, and I would not anticipate significant improvements at this juncture." (*Id.*) That request for continued commitment remained pending so Osman could respond. (Order, R.101, PageID # 547.)

On October 15, Osman apparently had a panic attack, feeling like he could not breathe, and, after treatment by nurses, he filed a written complaint about it with Dr. Preston, thinking the problem was due to the Abilify. (Inmate Request to Staff, R.105-1, PageID # 736.) But Dr. Preston did not even hear about the problem until a week later when defense counsel heard about it and then immediately notified her. (Holley/Preston Email, R.104-2, PageID # 729; Preston Response Emails, R.104-3, PageID # 731-32.)

Mr. Osman remains worried about the Abilify and does not want to take it.[2] (*See* Def.'s Response, R.110, PageID # 746.) He believes Abilify makes people go

---

[2] In an email filed with the district court, Dr. Preston stated that Mr. Osman has said he will voluntarily continue to take all the drugs due to advice he received from Fatima, his "wife." (Preston Email, R.109-1, PageID # 742-45.) But when undersigned counsel asked him about that statement, Mr. Osman said he is afraid to refuse medications because, if he does, FMC Springfield will put him in the isolation unit and classify him as dangerous, and so he said he would take the drugs.

crazy and he is afraid it will cause him to suffer a heart attack. (*Id.*) He says "'the whole thing is scary on top of scary on top of scary.'" (Holley/Preston Email, R.104-2, PageID # 729 (quoting Mr. Osman).)

Citing case law, Osman asked the district court to require the disclosure of medical records and to hold a hearing before deciding whether to grant another extension. (Def.'s Motion for Notice and Hearing, R.95, PageID # 537; Def.'s Response, R.104, PageID # 723-24.) The court did neither of these things.

Osman also pointed out that, according to the Supreme Court, to extend commitment for competency restoration, the government must prove not only "that the defendant probably soon will be able to stand trial" but also that it is making "progress toward that goal." *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). (Def.'s Response, R.104, PageID # 722-24.) And he pointed out that, after fifteen months of authorized commitment against Osman, the government still admits he remains incompetent, and, conspicuously enough, it has not even claimed that it has made progress towards restoring competency. (*Id.*)

The district court authorized four more months of forced treatment, saying only: "Based upon the information furnished by the treating physician, Dr. Baecht,[3] the court finds that there is a substantial probability that, within this

[3] "Dr Baecht" is "Dr. Preston-Baecht," who is not a "physician" but rather a psychologist and not qualified to prescribe medications. (Preston, Hr'g Tr., R.103, PageID # 557, 581).

additional period of time, the defendant will be restored to sufficient competency so that he will be able to proceed."  (Order, R.112, PageID # 749.)  It did not address the fact that the government has not even claimed, much less proven, that it has made progress towards the goal of restoring competency.  (*Id.*)

## SUMMARY OF THE ARGUMENT

To extend the commitment of a defendant solely for the purpose of restoring competency to stand trial, the government must prove not only "that the defendant probably soon will be able to stand trial" but also that it is making "progress toward that goal." *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). Continued commitment without such a showing violates the Due Process Clause. *Id.*

After the government had already had Osman committed for fifteen months for competency restoration, it sought another extension of four months. It did not even claim, much less prove, that it had made any progress towards the goal of restoring Osman to competency. Under *Jackson*, the extension violated the Due Process Clause. The Court should reverse and end Osman's commitment.

Two subsidiary points bolster this conclusion. First, the Due Process Clause demands proportionality—the duration of the commitment must bear a reasonable relation to its purpose. The government's purpose in committing Osman is to render him competent so he can then plead to a 30-month sentence and be released immediately since he has already overserved that sentence. The recent order further extends that over-incarceration, and the commitment is disproportionate.

Second, case law indicates the government has treated Osman unconstitutionally by unreasonably delaying his treatment to his detriment, primarily by holding him in a county jail for two months simply awaiting transfer.

## **STANDARD OF REVIEW**

This court reviews constitutional questions—including those of substantive or procedural due process—de novo because they are questions of law. *Hoang Minh Ly v. Hansen*, 351 F.3d 263, 266 (6th Cir. 2003).

## **ARGUMENT**

### I. It violates the Due Process Clause to commit Osman even longer absent proof of progress towards the goal of restoring him to competency.

"Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Accordingly, "[c]ommitment [of an individual] for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones v. United States*, 463 U.S. 354, 361 (1983) (internal quotation marks and citation omitted).

In *Jackson v. Indiana*, 406 U.S. 715 (1972), the Supreme Court held that the Due Process Clause limits how long a pretrial detainee, who is presently incompetent to stand trial, can be committed for competency restoration. *Id.* at 731-38. In *Jackson,* the State of Indiana had committed the defendant for that purpose pursuant to an Indiana statute that appeared to allow the commitment to continue indefinitely. The *Jackson* Court held that indefinite commitment for competency restoration violates due process. *Id.* at 738.

Doing so, it dictated what showings must be made to justify both the initial commitment for competency restoration and a continuation of that commitment. *Id.* at 738. It started by pointing out that "due process requires that the nature and duration of the commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* Then, in an express holding, it stated two standards, one applicable to the initial commitment and another to a continuation of the commitment. Below, each standard is marked, in turn, with italics.

> We hold, consequently, a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial *cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future*. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, *even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal*.

*Id.* at 738 (italics added). This holding makes it clear that, if a defendant has already been committed for a substantial period of time for the purpose of restoring competency, "his continued commitment must be justified by progress toward that goal," not just by proof that a defendant like him can reasonably be expected to soon be rendered competent. *Id.*

Demanding that showing of actual progress makes perfect sense because after a substantial period of commitment, a defendant is no longer just a

hypothetical patient. Rather, the government has had time to treat him and should be able to prove some progress toward the goal if indeed the government is acting responsibly and if indeed this particular defendant is restorable. A showing of actual progress is sensible in addition to being, under *Jackson*, compulsory.

Here, the government did not even claim it could make that compulsory showing of actual progress. Even though Osman had already been committed for fifteen months of competency restoration—nearly four times longer than the initial statutory maximum period of four months—the government could not point to any proof of progress towards the goal. Under *Jackson,* that fact alone mandates reversal and termination of Osman's commitment.

Two subsidiary points bolster this conclusion. First, the Due Process Clause demands proportionality. It "requires that the nature and duration of the commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738. The government's purpose in committing Osman is to restore him so he can plead guilty under the binding 30-month plea agreement, at which time he will be immediately released, having overserved his sentence by (as of today) at least six months. Due to this dynamic, the government's interest in continued commitment is increasingly slight. *Cf. United States v. Duncan*, 968 F. Supp. 2d 753 (E.D. Va. 2013) (declining to grant *Sell* authority when defendant's pretrial detention would exceed expected sentence

because of lack of governmental interest); *United States v. Rogers,* 83 F. Supp. 3d 657 (M.D.N.C. 2015) (same). By the same token, the nature of Osman's liberty interest is increasingly acute because it is almost certain that each additional day he serves in confinement will *not* be credited to a sentence. Each passing day makes the hardship of Osman's continued commitment increasingly out of proportion with the government's interest. By the time the latest four-month extension were to expire, Osman—who realistically faces a sentence of 30 months (26 months factoring in good-time credits)—would have spent almost 36 months in custody, 19 of which would have been spent committed for competency restoration.

Second, this dynamic, whereby delay benefits the government and hurts the defendant, may foster the kind of unconstitutional nonfeasance that Osman has1 already suffered by sitting in a county jail for two months waiting, despite his lawyer's complaints, for the transfer to FMC Springfield. Consider *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003). In that *Oregon Advocacy Center*, parties sued the Oregon State Hospital (OSH) because people like Osman—pretrial detainees ordered committed for competency restoration—were waiting "on average about one month in county jails before OSH accepted them for the requisite evaluation and treatment." *Id.* at 1106. In light of *Jackson*'s insistence on the government making actual progress in such cases, and in light of the harm of holding mentally ill detainees in county jail, the court upheld an

injunction requiring OSH to accept such individuals for competency restoration within seven days. *Id.* at 1107, 1122. As for the harmful impact, the court explained as follows.

> We are also mindful of the undisputed harms that incapacitated [*i.e.*, lacking competence to stand trial] criminal defendants suffer when they spend weeks or months in jail waiting for transfer to OSH. These harms include the following: Although jails can sometimes provide treatment to stabilize a patient, they cannot restore a patient to competency. Thus, incarceration in a county jail delays an incapacitated criminal defendant's possible return to competency. The disciplinary system that jails use to control inmates is ineffective for, and possibly harmful to, incapacitated criminal defendants. Because of their unpredictable or disruptive behavior, they are often locked in their cells for 22 to 23 hours a day, which further exacerbates their mental illness. Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly. These and other undisputed harms, together with OSH's statutory mandate to provide timely restorative treatment, support our conclusion below that OSH's delay in admitting incapacitated criminal defendants violates their substantive due process rights.

*Id.* at 1120. To Osman's detriment, the government has squandered much of its authorized fifteen months of commitment, most conspicuously the two months it unconstitutionally held him in county jail awaiting the transfer.

Finally, it bears noting that the statute on competency-restoration commitments, 18 U.S.C. § 4241, is largely irrelevant at this juncture because Osman's particular issue turns on reasonableness and the strictures of due process spelled out by *Jackson*. *Jackson*'s strictures—including the requirement that a continued commitment be justified by proof of progress toward the goal—would

trump any standard established by statute. The fact that the district court summarily cited that statutory standard while granting a third[4] continuation, without even mentioning *Jackson*, only underscores its error. And its error is all the more troubling because, before ruling, it refused to grant Osman the requested access to medical records or to hold an evidentiary hearing, even though a continuation decision under § 4241(d)(2) must comport with procedural due process. *United States v. Magassouba*, 544 F.3d 387, 406-07 (2d Cir. 2008). The summary nature of the continuation order serves to further show that again continuing Osman's commitment violated his constitutional rights.

## CONCLUSION

Defendant Ahmed Osman had previously been committed for competency restoration for more than fifteen months. Yet the government could show absolutely no progress towards its goal, even as Osman's detention extended past his anticipated sentence. Because his continued commitment violates the due-process dictate of *Jackson*, this Court should reverse with instructions that Osman's commitment cease.

---

[4] The district court issued a first authorization under § 4241(d)(1), a second one under § 4241(d)(2), a third one under § 4241(d)(1) again, and the fourth one under § 4241(d)(2). The third authorization probably should have been issued under § 4241(d)(2), not (d)(1), but that does not matter for the due process analysis since, after fifteen months of authorized commitment, the government was certainly, in this final instance, seeking another continuation of commitment.

Respectfully submitted,

*s/ Michael C. Holley*
MICHAEL C. HOLLEY
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

Counsel for Mr. Osman

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2018, I electronically filed this *Appellant's Principal Brief* with the Clerk, U.S. Court of Appeals for the Sixth Circuit, which will send a Notice of Electronic Filing to Mr. Joseph Montminy, Assistant United States Attorney, 110 Ninth Avenue North, Suite A961, Nashville, Tennessee, 37203.

*s/ Michael C. Holley*
MICHAEL C. HOLLEY

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), Federal Rules of Appellate Procedure, I certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B) in that it contains 4,981 words. In certifying the number of words in the brief I have relied on the word count of the word-processing system used to prepare the brief.

*s/ Michael C. Holley*
MICHAEL C. HOLLEY

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), the appellant designates the following district court documents as relevant.

| Description of Entry | Date Filed in District Court | Record Number | Page ID # |
|---|---|---|---|
| Indictment | 4/13/16 | 15 | 27-29 |
| Motion to Continue | 8/29/16 | 26 | 43 |
| **Sealed** Holley Affidavit | 8/29/16 | 28 | N/A |
| **Sealed** Report | 10/12/16 | 33 | N/A |
| **Sealed** Holley Affidavit | 10/12/16 | 33-1 | N/A |
| Order | 10/17/16 | 39 | 71 |
| Order | 1/31/17 | 40 | 72 |
| **Sealed** Szyhowski Report | 1/31/17 | 41 | N/A |
| Arizona Conviction Documents | 4/5/17 | 49-4 | 127-142 |
| Summary of Recorded Stmt. | 4/5/17 | 49-5 | 143-150 |
| Texts | 4/5/17 | 49-6 | 151-173 |
| Report of FBI Agent Rice | 4/5/17 | 49-7 | 174-177 |
| Recording of Statement | 4/20/17 | 68 | N/A |
| Hearing Transcript | 4/24/17 | 69 | 235-372 |
| Agreed Order | 4/27/17 | 72 | 432-433 |
| Order | 12/11/17 | 75 | 437 |

| | | | |
|---|---|---|---|
| Order | 3/29/18 | 77 | 449 |
| Motion | 4/16/18 | 79 | 466-475 |
| Plea Agreement | 4/16/18 | 79-1 | 476-493 |
| Order | 7/11/18 | 92 | 525-528 |
| Motion for Hearing | 9/24/18 | 95 | 533-538 |
| **Sealed** Preston Email | 10/12/18 | 98-1 | N/A |
| Order | 10/16/18 | 101 | 547 |
| Hearing Transcript | 10/19/19 | 103 | 549-715 |
| Defendant's Response | 10/22/18 | 104 | 716-732 |
| Holley Email | 10/22/18 | 104-1 | 726-727 |
| Holley/Preston Email | 10/22/18 | 104-2 | 728-729 |
| Preston Response Emails | 10/22/18 | 104-3 | 730-732 |
| Inmate Request to Staff | 10/23/18 | 105-1 | 735-736 |
| **Sealed** Preston Email | 10/30/18 | 109-1 | N/A |
| Defendant's Response | 10/30/18 | 110 | 746-747 |
| Order | 11/1/18 | 112 | 749 |
| Notice of Appeal | 11/2/18 | 113 | 750 |
| Preliminary Hrg. Transcript | 4/21/16 | 115 | 754-801 |